IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANTHONY G. CHRISTOU, | :: | CIVIL ACTION NO. |
|     Movant, | :: | 1:10-CV-2988-WSD-LTW |
| | :: | |
|     v. | :: | CRIMINAL ACTION NO. |
| | :: | 1:06-CR-483-WSD-LTW |
| | :: | |
| UNITED STATES OF AMERICA, | :: | MOTION TO VACATE |
|     Respondent. | :: | 28 U.S.C. § 2255 |

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

The Report and Recommendation of the United States Magistrate Judge, made

in accordance with 28 U.S.C. § 636(b)(1) and this Court's Local Rule 72, is attached.

The same shall be filed and a copy, together with a copy of this Order, shall be served

upon counsel for the parties and upon any unrepresented parties.

Pursuant to 28 U.S.C. § 636(b)(1)(C), within fourteen (14) days of service of

this Order, each party may file written objections, if any, to the Report and

Recommendation.  If objections are filed, they shall specify with particularity the

alleged error or errors made (including reference by page number to the transcript if

applicable) and shall be served upon the opposing party.  The party filing objections

will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court.  If no objections are filed, the Report and

Recommendation may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).

The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Judge after expiration of the above time period.

**SO ORDERED**, this /6 day of August , 2011.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANTHONY G. CHRISTOU, | :: | CIVIL ACTION NO. |
| Movant, | :: | 1:10-CV-2988-WSD-LTW |
| | :: | |
| v. | :: | CRIMINAL ACTION NO. |
| | :: | 1:06-CR-483-WSD-LTW |
| | :: | |
| UNITED STATES OF AMERICA, | :: | MOTION TO VACATE |
| Respondent. | :: | 28 U.S.C. § 2255 |

## FINAL REPORT AND RECOMMENDATION

Movant, through counsel, challenges under 28 U.S.C. § 2255 his convictions in this Court for wire fraud and money laundering. (Docs. 140, 143, 149.)[1] Respondent has filed a response opposing the motion, (Doc. 146), and Movant has filed a reply, (Doc. 148). The undersigned recommends that Movant's motion be denied and that he be denied a certificate of appealability.

## I.   BACKGROUND

The indictment in this case charged Movant with four counts of wire fraud in violation of 18 U.S.C. § 1343 and three counts of money laundering in violation of 18 U.S.C. § 1957. (Doc. 1.) Attorney Steven Berne represented Movant in pretrial proceedings and at trial. The case was tried on February 13-21, 2008, and the jury found Movant guilty on all counts. (Doc. 83.) After trial, but before sentencing, Movant

---

[1] Movant's § 2255 motion and exhibits one through four to the motion are at docket number 140, his amendment to the motion is at docket number 143, and exhibit five to the motion is at docket number 149. Unless otherwise indicated, all citations to the record in this Report and Recommendation refer to criminal action number 1:06-CR-483-WSD-LTW.

retained attorney Donald Samuel, who continues to represent him in this matter. On August 4, 2008, the Court sentenced Movant to 118 months of imprisonment, three years of supervised release, a special assessment, and over fourteen million dollars in restitution. (Doc. 120.) Movant appealed, and the appellate court affirmed his convictions and sentence. *United States v. Christou*, 334 F. App'x 950 (11th Cir. 2009).

Movant's wire fraud consisted of him obtaining money from numerous individuals, or investors, under the false pretense that the funds would be used to underwrite short-term, high-interest bridge loans that Movant made to wealthy individuals in connection with real estate purchases and improvements. Movant gave each investor a promissory note in exchange for their money. In reality, Movant, who owned his own mortgage broker business, never made any bridge loans to anyone. Instead, Movant used the money investors gave him to pay the interest owed to earlier investors – a classic Ponzi scheme – and to pay his debts at several casinos in the United States that he frequented. Movant deposited the investors' money in his personal bank account at Branch Banking & Trust ("BB&T"), including via interstate wire transfers, and paid some interest to some investors from funds in that account. Movant laundered the money obtained in his scheme by transferring more than $10,000 from his BB&T account to casinos in other states on multiple occasions.

Movant committed his fraud from approximately 2001 to 2006. In 2006, both Movant and his mortgage broker company filed bankruptcy petitions. In his personal filing, Movant listed $35 million in unsecured claims by creditors, most of which

2

involved the promissory notes he gave investors as part of the fraudulent scheme.

At trial, nine of the individuals who invested and lost their money in the fraud testified on behalf of Respondent. Two of those individuals were Micki Guthrie and Sotirios Karras.

Guthrie testified that she and her husband, through their company Mid Continental, gave Movant $305,000 from September 2004 to December 2005 in exchange for eight thirty-day promissory notes with high interest rates. (Trial Tr. at 833, 835-43, 846, 848, 865-66.)[2] Guthrie testified that Movant "paid" her interest on the notes monthly by writing checks to her, but that he kept the checks and reinvested the payments into new loans under new promissory notes because he told her he did not have the money in the bank. (*Id.* at 847-48, 861-68.) Because Movant would "take [the interest] and put it into another note," the interest payments were "just paper returns," according to Guthrie. (*Id.*) Guthrie further testified that Movant sometimes offered her cash as interest payments, but she refused it. (*Id.* at 847, 861-62.)

The interest payments that Movant reinvested into new loans from Guthrie amounted to over $500,000, bringing the grand total that Guthrie invested with Movant – the "paper returns" plus the $305,000 she and her husband actually gave Movant – to approximately $850,000. (*Id.* at 864.) Guthrie testified that the only money she actually received from Movant was $17,000, which she received in March and April 2006, after

---

[2] The transcript of the trial is in the record at docket numbers 100-105 and 112-113.

Movant told her that he could not repay the promissory notes and she had retained a lawyer. (*Id.* at 849-52.) Subtracting the $17,000 Guthrie testified she actually received from Movant from the $305,000 she actually paid him, Guthrie testified she was "$288,000 plus out of my money." (*Id.*)

Karras testified that he gave Movant approximately $150,000 in exchange for short-term, high-interest promissory notes. (*Id.* at 1021-22.) Like Guthrie, Karras testified that Movant reinvested $30,000 - $40,000 in interest into new loans with new promissory notes. (*Id.* at 1024.) Karras testified that he actually received only $8,000 - $9,000 from Movant. (*Id.*)

Movant's BB&T account records contradict Guthrie's and Karras' testimony regarding the amount of money they actually received from Movant after investing in the purported bridge loans. (*Id.* at 988-1000 & Ex. 120.) Internal Revenue Service ("IRS") agent Bryant Brooks testified at trial that he and others reviewed the transaction records of Movant's BB&T account from 2004 to April 2006. (*Id.* at 988-90.) Brooks personally prepared two spreadsheets summarizing those records – one listed the debits, or distributions, from Movant's BB&T account by payee and date and the other listed the credits, or receipts, into the account – and those summaries were admitted into evidence at trial. (*Id.* at 990 & Exs. 119-20.)[3] The debit summary showed that Movant wrote ten checks totaling $174,994 to Mid Continental, Guthrie's business, and that

---

[3] The debit summary, exhibit 120, is also exhibits two and three to Movant's § 2255 motion. (*See* Doc. 140 Exs. 2-3.)

4

those checks cleared Movant's account. (Trial Ex. 120 at 31, 37, 39, 44.)  The debit summary showed that Movant wrote twenty checks totaling $145,960 to Karras and that those checks cleared Movant's account. (*Id.* at 17, 24, 29-31, 34-35, 37, 39, 44, 47.) Sherry Van Wagoner, Movant's secretary, also contradicted Guthrie's testimony in that she testified that she personally gave Guthrie cash interest payments on at least two occasions. (*Id.* at 671, 1281-82.)

After Movant filed his § 2255 motion, Respondent gave him a one-page spreadsheet prepared by Guthrie, which Movant states Guthrie gave to Respondent's case agent on the day she testified at trial. (Doc. 143; Doc. 146 at 11-12; Doc. 148 at 2-3; Doc. 149.)  The document, which the undersigned will refer to as the "Guthrie Document," is exhibit five to Movant's § 2255 motion. (Doc. 149.)  Respondent states that the Guthrie Document should have been produced to Movant as discovery and that it appears that it inadvertently was not produced. (Doc. 146 at 11-12.)  Movant states that the Guthrie Document was not produced to him or Berne before or during trial. (Doc. 143.)  According to Respondent, Guthrie used the Guthrie Document to track the promissory notes she obtained in exchange for the money she gave Movant and the interest paid on those notes. (Doc. 146 at 11.)

During Karras' testimony at trial, Respondent played an audio recording of a meeting that Karras and Movant had with Lee Katz on January 29, 2006. (Trial Tr. at 1026-77.)  The recording and a written transcript of it were admitted into evidence. (*Id.* at 1029-32 & Exs. 70, 70-A, 70-B.)  Katz advised individuals and companies on debt

restructuring and financial issues and also went to law school, but he did not practice law. (*Id.* at 764-70.) Movant and Karras sought Katz's help in re-negotiating the debt Movant owed to the numerous promissory note holders that he could not pay and in developing a payment schedule or plan. (*Id.* at 1026-77.) Movant told Katz that he had "[b]orrow[ed] from Peter to pay Paul" and estimated that he owed twelve to fifteen million dollars to the note holders. (*Id.* at 1042-43.) Movant told Katz that "[t]here couldn't be enough money gotten to keep paying . . . I never had enough," (*id.* at 1045), and that "the end result is whoever's in it the longest makes[,] whoever is in the least loses," referring to the note-holders, (*id.* at 1056). Karras told Katz that some of the note-holders could go to the "DA," apparently referring to a district attorney, to which Katz replied that if they did "the whole thing falls apart." (*Id.* at 1047.)

When Karras asked Katz at the meeting if he could help Movant, Katz said that he could, but stated that he would have to bring in a friend and former federal prosecutor to advise Movant on legal issues. (*Id.* at 1035-36, 1048, 1051.) Katz told Movant that he had "a big IRS issue," but that he "need[ed] to check with somebody to be sure." (*Id.* at 1052-54.) Katz also said that "we have a fraud issue from you" and that he did not know whether the situation "classifies as . . . a Ponzi scheme or . . . a pyramid scheme." (*Id.* at 1055-56.) Katz said that the lawyer and former federal prosecutor would have to advise them on that issue. (*Id.* at 1056.) Katz told Movant that he needed to get him in touch with the lawyer because "before I start playing let's make a deal, I want to make sure you're protected legally, and [the lawyer] understands what we have to do" and

6

"can tell us what the legal issues are." (*Id.* at 1066-67.) Katz did not testify at trial.

After trial, Movant objected to the loss amount shown in the presentence report, among other things. (Docs. 116, 118.) At sentencing, Samuel, Movant's current counsel, successfully argued that less than fifty victims should be considered for sentencing purposes. (Doc. 126 ("Sent. Tr.") at 10-25, 66-71.) The Court sustained Movant's objection on that issue, thus lowering the advisory imprisonment range under the U.S. Sentencing Guidelines (the "Guidelines"). (Sent. Tr. at 66-71.) The presentence report set the loss amount at seven to twenty million dollars, which is a particular range under the Guidelines. (*Id.* at 12.) Movant did not object to that range, but argued that the actual loss amount was approximately ten million dollars. (*Id.*)

Movant asserts four claims in his § 2255 motion. (Doc. 140 at 1.) Three of those claims are that Movant received ineffective assistance of counsel at trial and at sentencing. (*Id.*) Movant argues that Berne was ineffective for not cross-examining Guthrie and Karras about their false testimony and for not requesting a limiting instruction regarding Katz's statements on the audio recording played at trial. (*Id.* at 1-8, 12-13.) Movant also argues that Samuel was ineffective for not contesting the loss amount at sentencing. (*Id.* at 1, 13.) Movant's fourth claim is that Respondent violated his right to due process by knowingly presenting false testimony from Guthrie and Karras at trial and by not producing the Guthrie Document so that it could be used at trial. (Doc. 140 at 1, 8-12; Doc. 143.) Movant concedes that he did not raise, on appeal, any of the claims or issues in his § 2255 motion. (Doc. 140 at 2-3.)

7

## II.   THE 28 U.S.C. § 2255 STANDARD

To prevail on a § 2255 motion, the movant must demonstrate that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the Court was without jurisdiction to impose such a sentence; (3) the sentence exceeded the maximum sentence authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255. A sentence is subject to collateral attack when there is a fundamental defect that results in a complete miscarriage of justice. *United States v. Addonizio*, 442 U.S. 178, 185 (1979). "To obtain collateral relief, a [movant] must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982).

## III.   ANALYSIS

An evidentiary hearing is not warranted if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *Fontaine v. United States*, 411 U.S. 213, 215 (1973). As discussed below, the record in this case conclusively demonstrates that Movant's claims lack merit and that he is not entitled to relief under § 2255.

### A.   Movant Has Not Shown That Berne Was Ineffective At Trial

To establish ineffective assistance of counsel, a § 2255 movant must show that his counsel's performance was deficient such that it was below objectively reasonable standards, and that the deficient performance prejudiced the movant. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). As for the first prong of the test, a court

8

should be "highly deferential" in scrutinizing counsel's performance, *id.* at 689, and "must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment," *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000). To establish deficient performance, a movant must establish that no objectively competent lawyer would have taken the action that his lawyer took. *Id.* at 1315.

Under the second prong of the test, a court determines whether counsel's challenged acts or omissions prejudiced the movant, i.e., whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A court need not address both prongs of *Strickland*'s test if the movant "makes an insufficient showing on one." *Id.* at 697.

Movant contends that after Berne unsuccessfully argued to exclude from trial the audio recording of the meeting between Movant, Karras, and Katz, Berne should have requested a limiting instruction that the jury could not consider Katz's statements for their truth. Movant contends that Katz's statements during the meeting about Movant facing tax and fraud issues and referencing a Ponzi scheme were damaging and should not have been considered for their truth. Alternatively, Movant argues that Berne should have requested that those statements be redacted from the recording so the jury would not have heard them.

9

Given Katz's repeated statements during the meeting that he did not know the legal ramifications of Movant's conduct and that he would have to engage a lawyer to address those issues, along with Movant's own incriminating statements during the meeting, it was not unreasonable for Berne to not request redaction or a limiting instruction regarding Katz's limited references to potential legal issues. A minimally competent lawyer could have reasonably concluded that not only was there no benefit to obtaining a limiting instruction, but that doing so could have highlighted Katz's statements to the jury and drawn more attention to them. Moreover, Katz never said in the meeting that Movant had broken the law, committed fraud, or engaged in a Ponzi scheme; instead, he repeatedly stated that he was not the one to ask about the legal issues and that he would have to get a lawyer to review those issues. (Trial Tr. at 1035-36, 1048, 1051, 1056, 1066-67.) Katz even suggested a particular lawyer and mentioned him several times. (*Id.*) When considering the meeting as a whole – and the jury heard the recording of the entire meeting – Movant has not shown that no objectively competent lawyer would have failed to request redaction or a limiting instruction as to Katz's isolated comments about which Movant complains.

Movant also has not shown that the absence of redaction or a limiting instruction prejudiced him. As discussed above, Katz's isolated statements were not harmful because he did not make any conclusions about Movant's potential legal liability, the jury knew that Movant consulted Katz as a financial consultant and not as a lawyer, and Katz repeatedly stated that a lawyer would have to look at the potential legal issues.

Movant's own statements at the meeting regarding his potential legal liability were far more damning than Katz's statements. Movant stated that he had discussed his situation with a civil lawyer and a criminal lawyer, the latter of which, after reviewing the facts for a few days, advised Movant to hire a criminal defense lawyer. (Trial Tr. at 1069-70, 1074.) Movant told Katz that his "weakness" from a liability standpoint was that "there was misleading" and that because he borrowed new money to pay old money "I've got that against me." (*Id.* at 1071-72.) In contrast to Katz's statement that he did not know whether Movant's transactions with the note-holders were a Ponzi or pyramid scheme, Movant unequivocally stated that he "[b]orrow[ed] from Peter to pay Paul," (*id.* at 1042-43), and that "whoever's in it the longest makes[,] whoever is in the least loses," (*id.* at 1056).

Movant's statements were not hearsay because Respondent offered them and, thus, they were admissible at trial for their truth. *See* Fed. R. Civ. P. 801(d)(2). Even if Katz's isolated statements about potential legal issues, which were much more equivocal than Movant's statements, had been redacted or subject to a limiting instruction, there is no reasonable probability that the outcome of the trial would have been different. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2265 (2010) ("The record establishes that it was not reasonably likely that the [limiting] instruction would have made any difference in light of all the other evidence of guilt."); *cf. Earls v. McCaughtry*, 379 F.3d 489, 493-94 (7th Cir. 2004) (holding that trial counsel's failure to redact portion of videotaped interview of child victim, despite agreement to do so

11

before trial, prejudiced defendant because his guilt "hinged on whether the jury believed" the child and no witnesses corroborated the child's story).

Movant also has not shown that Berne was ineffective for not cross-examining Guthrie and Karras about their purported lies regarding the amount of money Movant paid them as interest on their promissory notes. The only evidence Movant identifies that Berne had at trial to contradict Guthrie's and Karras' testimony was the summary of debit transactions in Movant's BB&T account, which Respondent admitted at trial through the testimony of IRS agent Brooks, who personally prepared the document. (Doc. 140 at 12-13; Doc. 148 at 13-14.) Brooks testified (and the BB&T records were admitted into evidence) after Guthrie testified and before Karras testified. Berne would have been limited in his ability to impeach Guthrie on cross-examination with the BB&T debit summary – extrinsic evidence – because the document was not yet in evidence, Guthrie did not prepare it and likely had never seen it, and Berne could have admitted it into evidence only by calling Brooks as a witness because only Brooks could authenticate it.

Instead of asking Guthrie and Karras on cross-examination about payments shown on the BB&T records, Berne chose to re-call Van Wagoner in Movant's case-in-chief and ask her whether she had given some of the victims interest payments on their promissory notes. Van Wagoner testified, in direct contradiction to Guthrie's testimony, that she gave Guthrie cash interest payments on at least two occasions. (*Compare* Trial Tr. at 847, 861-62, *with id.* at 1281-82.) Berne also told the jury in his closing argument

12

that Van Wagoner's testimony and the BB&T records directly contradicted Guthrie's and Karras' testimony about the payments they received and characterized those witnesses as liars. (*Id.* at 1445-46.) Berne's strategy in this regard was objectively reasonable. Movant has not shown that no reasonably competent lawyer would have chosen not to ask Guthrie and Karras questions likely to elicit the same, unequivocal answers they gave on direct examination and instead rely on other witnesses' testimony and documentary evidence – presented by Respondent – to impeach Guthrie and Karras.

Movant also has not shown that he was prejudiced by Berne's decision not to use the information in the BB&T records in his cross-examination of Guthrie and Karras. Given the other evidence regarding Movant's payments to note-holders, presented by both Movant and Respondent throughout the trial, there is no reasonable probability that the outcome of the trial would have been different had Berne cross-examined Guthrie and Karras differently. The other evidence and facts demonstrating that Movant was not prejudiced are discussed in Part III.C., *infra*. It is unnecessary to repeat that discussion here.

**B.     Movant Has Not Shown That Samuel Was Ineffective At Sentencing**

Movant contends that Samuel should have objected at sentencing to not only the number of victims, but also to the loss amount, which the Court found was between seven and twenty million dollars. Movant contends that because the number of victims in the presentence report was incorrect, as Samuel successfully argued at sentencing, it follows that the loss amount range also was incorrect. Movant contends that Samuel's

13

failure resulted in the Guidelines range being two levels higher than if the loss amount had been less than seven million dollars. *See* U.S. Sentencing Guidelines Manual § 2B1.1(b) (2008).

Movant offers nothing more than speculation to support his ineffective assistance claim against Samuel, and that is insufficient to obtain relief. *See Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) ("Conclusory allegations of ineffective assistance are insufficient." (quotations omitted)). It was not unreasonable for Samuel not to object to the loss amount at sentencing given that he had no evidence to support a finding that the loss amount was less than seven million dollars and given the Court's statements at sentencing that suggest any such objection would have failed absent hard evidence. The Court noted that a large amount of money was involved in Movant's fraudulent scheme, (Sent. Tr. at 8), and that the gross loss was forty million dollars and the net loss was fourteen million dollars, (*id.* at 20). In discussing the vast nature of Movant's fraudulent scheme, the Court told Samuel "that to the extent that you want me to exercise my discretion, you are undercutting your credibility" by arguing that Movant's conduct really was not as bad as it seemed. (*Id.* at 25.) A minimally competent lawyer could have reasonably concluded that it would have been futile to object to the loss amount under those circumstances.

Samuel presented, before sentencing, a letter from legal counsel for the bankruptcy trustee for Movant's bankruptcy case, (Doc. 118-1), and the Court heard testimony at sentencing from the trustee, (*id.* at 46-63). That evidence, particularly the

14

letter, indicated that Movant paid some victims most or all of the money they loaned him and that those victims did not lose as much money as previously thought. However, that evidence did not suggest that the loss amount was less than seven million dollars or even less than the ten million dollars that Samuel told the Court was likely the correct figure. In short, that evidence further indicates that it was reasonable for Samuel not to object to the loss amount.

Movant also has not shown a reasonable probability that an objection to the loss amount would have been successful and, thus, has not shown that he was prejudiced by Samuel's decision not to object. Movant offers nothing more than speculation and conclusory assertions. *See Johnson v. Alabama*, 256 F.3d 1156, 1183 (11th Cir. 2001) (rejecting ineffective assistance claim where there was "no logical basis" and "little evidentiary foundation" to support a finding of prejudice); *Wilson*, 962 F.2d at 998 (rejecting § 2255 movant's claim that lawyer unreasonably failed to object to drug amount at sentencing because the movant "has not suggested any factual basis upon which counsel could have relief in making such a challenge"). Movant's claim that he received ineffective assistance of counsel at sentencing fails.

## C.   **Movant Procedurally Defaulted His Due Process Claim**[4]

"Generally, if a challenge to a conviction or sentence is not made on direct appeal,

---

[4] The undersigned refers here to Movant's claim that Respondent presented false testimony at trial in violation of his due process rights. Movant's claim that Respondent's failure to produce the Guthrie Document violated his due process rights could not have been raised on appeal because Movant was not aware of the Guthrie Document until after his appeal concluded.

it will be procedurally barred in a [] § 2255 challenge" unless the movant shows "both cause for his default as well as demonstrating actual prejudice suffered as a result of the alleged error." *Black v. United States*, 373 F.3d 1140, 1142 (11th Cir. 2004). "[T]o show cause for procedural default, [a § 2255 movant] must show that some objective factor external to the defense prevented [him] . . . from raising his claims on direct appeal and that this factor cannot be fairly [attributed] to [his] own conduct." *Lynn v. United States*, 365 F.3d 1225, 1235 (11th Cir. 2004). "Actual prejudice" requires a movant to show that the alleged error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Reece v. United States*, 119 F.3d 1462, 1467 (11th Cir. 1997).

A court also may review a claim in a § 2255 motion that was not raised on appeal if "a constitutional violation has probably resulted in the conviction of one who is actually innocent" and thus would result in a fundamental miscarriage of justice absent review. *Lynn*, 365 F.3d at 1234-35 (quotations omitted). "Actual innocence means factual innocence, not mere legal innocence." *Id.* at 1235 n. 18 (quotations omitted). In this regard, a § 2255 movant must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence" not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995).

Movant concedes that he did not raise on appeal his due process claim regarding Guthrie's and Karras' allegedly false trial testimony. (Doc. 140 at 3.) He contends that Respondent's misconduct in introducing the false testimony was "not sufficiently known

16

to [him] (or provable) during the course of the trial and thus could not be raised previously." (*Id.*) Although the claim might not have succeeded on appeal, "[i]n procedural default cases, the question is not whether legal developments or new evidence has made a claim easier or better, but whether at the time of the direct appeal the claim was *available at all*." *See Lynn*, 365 F.3d at 1235 (emphasis added). Movant's due process claim was available to him before appeal, yet he did not raise it and, thus, procedurally defaulted it.

Movant's claim that Respondent knowingly presented false testimony at trial from Guthrie and Karras clearly was available to him on appeal because other evidence presented at trial supported his claim and both his trial counsel and sentencing counsel argued the point in this Court on numerous occasions. Movant's BB&T records, which were admitted at trial, directly contradicted Guthrie's and Karras' testimony that they received only a few thousand dollars from Movant. (Trial Ex. 120.) Van Wagoner's testimony that she gave Guthrie cash interest payments on at least two occasions also contradicted Guthrie's testimony on that issue. (Trial Tr. at 1281-82.) Berne pointed out those discrepancies in his closing argument, (Trial Tr. at 1445-46), and Samuel did the same at sentencing based on the trial evidence and the additional evidence obtained from the bankruptcy trustee after trial, (Doc. 118; Doc. 118-1; Doc. 126 at 61-63.) Indeed, in his sentencing memorandum, Samuel argued that Guthrie's trial testimony regarding the amount of money Movant paid her was "demonstrably false" and that it was not evident "[w]hy the government allowed her to testify, without correction, that

17

she loaned $305,000 and received nothing in return." (Doc. 118 at 2.)  In sum, even if Movant's claim that Respondent presented false testimony from Guthrie and Karras was not strong – because of the absence of the Guthrie Document or otherwise – it clearly was available to him on appeal.

Movant does not contend that he is actually innocent, as a factual matter, of the crimes of which he was convicted.  Thus, Movant must show cause and prejudice for procedurally defaulting his due process claim.  Movant has failed to do so.

Respondent's belated production of the Guthrie Document did not prevent Movant from raising his due process claim on appeal because, as discussed above, there was ample evidence at trial and in the sentencing record upon which to base the claim. "That [Movant] did not possess, or could not reasonably have obtained, certain evidence fails to establish cause if other known or discoverable evidence could have supported the claim in any event." *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  In a similar case alleging a new claim of prosecutorial misconduct based on newly discovered evidence, the Eleventh Circuit found no cause to excuse the procedural default where there was a sufficient basis for the claim before the new evidence was discovered. *Lynn*, 365 F.3d at 1236-39; *see McCleskey*, 499 U.S. at 498 ("Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim.").  Other than his belated receipt of the Guthrie Document, Movant offers no cause for his failure to raise his due process claim on appeal.  Movant therefore has not shown that his procedural default of the claim should be excused.

### D.  **Movant's Due Process Claim Fails On Its Merits**

Even if Movant had not procedurally defaulted his due process claim, it nonetheless fails on its merits. Movant's claim is grounded in *Giglio v. United States*, 405 U.S. 150 (1972) and *Brady v. Maryland*, 373 U.S. 83 (1963).

The government's knowing presentation of false, material testimony at trial violates a defendant's right to due process "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *DeMarco v. United States*, 928 F.2d 1074, 1077 (11th Cir. 1991). "The materiality element is satisfied if the false testimony could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Dickerson*, 248 F.3d 1036, 1041 (11th Cir. 2001) (quotations omitted). The government's failure to produce evidence in its possession to the defendant violates the defendant's right to due process if: (1) the evidence is favorable to the defendant, either because it is exculpatory or is impeaching; (2) the government suppressed the evidence either willfully or inadvertently; and (3) prejudiced ensued, i.e., the evidence was material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Favorable evidence is material when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 698 (quotations omitted); *see Dickerson*, 248 F.3d at 1042 n.3 (observing that the materiality standard for a *Brady* claim is the same as that for a *Giglio* claim). The defendant "must show a reasonable probability of a different result." *Id.* at 699 (quotations omitted).

19

Movant's *Giglio* claim – that Respondent knowingly allowed Guthrie and Karras to falsely testify about the amount of money they received from Movant – fails because there is no reasonable likelihood that the testimony, assuming its falsity, could have affected the jury's judgment. Movant's primary defense theory at trial appeared to be that he intended to repay all the loans to the note-holders, rather than defraud them, and that evidence of interest and principal payments on the notes proved his legitimate, lawful intentions.[5] Even if Guthrie and Karras falsely testified that they received much less money from Movant than they actually received in payment on their notes, a great deal of evidence regarding Movant's payments to note-holders was presented to the jury via numerous witnesses and documentary evidence.

Guthrie and Karras were only two of nine note-holders, all victims of Movant's fraudulent scheme, who testified at trial. Guthrie, Karras, and other note-holders admitted – during direct examination by Respondent, who called them as witnesses – that they received money from Movant as payment on the notes. (Trial Tr. at 597, 599, 849-52, 1024.) Van Wagoner testified, during both her initial testimony for Respondent and when Movant re-called her in his case-in-chief, that she gave note-holders,

---

[5] In his § 2255 motion, Movant states that Guthrie, Karras, and the other lenders loaned him money in part because "he paid the interest and allowed [them] . . . to roll over their loans to make even more money." (Doc. 140 at 9.) Given Movant's claim that he and the lenders simply made legitimate loans, it is unclear why it matters (and why it would matter to the jury) whether any of the lenders received interest in cash or whether interest was reinvested into new promissory notes for the lenders' benefit. In either case, Movant could argue that he "paid the interest" on the notes. Movant has not explained why his defense depended on evidence that lenders received interest in cash rather than in another form.

including Guthrie, money as payment on their notes. (*Id.* at 678, 1281-82.) IRS agent Brooks, another government witness, testified that Movant's BB&T account records reflected "a number of payments" to note-holders. (*Id.* at 996, 998.) Brooks' summary of the distributions from Movant's BB&T records was admitted into evidence and clearly showed numerous payments to numerous note-holders. (*Id.* Ex. 120.) Indeed, the document showed ten payments to Guthrie's business and twenty payments to Karras for much more money than they testified that they received. (*Id.*) Berne highlighted those discrepancies in his closing argument. (*Id.* at 1445-46.)

Even more evidence was presented at trial that Movant paid interest to note-holders. During the recorded meeting with Katz and Karras, Movant told Katz that he paid note-holders in cash and with checks and sometimes directly paid the note-holders' credit accounts at their request. (*Id.* at 1041-43, 1044, 1049, 1051-54, 1071 ("I know one person last year I paid over a million and a half dollars.").) The trustee for Movant's bankruptcy testified that not only were note-holders paid, some of them were "net winners," i.e., "someone that was paid more money than they loaned overall, so that at the end [of the] day . . . they received more than they ultimately put in." (*Id.* at 805.) All of the evidence just described – the vast majority of which Respondent presented – is consistent with the defense that Movant simply borrowed money and intended to pay the interest and repay the principal as a legitimate debt. It is not surprising that there was so much evidence regarding payments to note-holders given that the indictment, itself, alleged that Movant made principal and interest payments to note-holders and

repaid some of his obligations.  (Doc. 1 at 4-5.)

Because the jury had substantial evidence that Movant paid a lot of money to note-holders, including Guthrie and Karras, as he had promised to do, Guthrie's and Karras' understatement – even if knowingly false – of the amount of money they received from Movant could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury's verdict.  In considering a *Giglio* claim, the Eleventh Circuit has observed:

> Whether the false testimony offered in a particular case could in any reasonable likelihood have affected the judgment of the jury must be analyzed in light of a number of highly context-specific factual considerations, including the importance of the testimony of the falsely testifying witness to the government's case, the nature and significance of the falsehood, and, notably, to what extent the witness's testimony is substantially corroborated by other evidence.

*Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1281 (11th Cir. 2005).  In this case, those "context-specific factual" considerations, discussed above, demonstrate that Movant's due process claim based on the alleged false testimony of two witnesses fails.

Movant's *Brady* claim – that Respondent suppressed the Guthrie Document until after his trial and appeal – also fails.  As an initial matter, the Guthrie Document is not exculpatory and does not impeach Guthrie's testimony.  Guthrie put a column titled "Mid Cont Money Pd" and a column titled "Interest Pd" on the document and listed dollar amounts under each column by date.  (Doc. 149 at 3.)  The amounts listed in the "Mid Cont Money Pd" column total $850,000, to which Guthrie added $41,998 she labeled as "Insuf Cks" for a grand total of $891,998.  (*Id.*)  The "Interest Pd" column

totals $586,310, to which Guthrie added a February 2006 payment for $7,000 and a March 2006 payment for $10,000, resulting in a grand total of $603,310. (*Id.*) Guthrie then subtracted the grand total "Interest Pd" from the grand total "Mid Cont Money Pd" to arrive at a bottom-line figure (shown at the bottom center of the document) of $288,688. (*Id.*)

Movant contends that the "Interest Pd" column on the Guthrie Document lists money Guthrie (or her business Mid Continental) actually received from Movant, and thus contradicts her testimony that she actually received only $17,000 from him. The only support for Movant's argument is the letters "Pd" – which the undersigned accepts as an abbreviation for "Paid" – that appear next to the word "Interest" in the column heading. However, while Guthrie testified at trial that she was "paid" interest on her notes, she clarified that all but $17,000 of those "payments" was rolled over into new promissory notes and, thus, was "just paper returns" that she did not actually receive in monetary form. (Trial Tr. at 845, 851-52, 864-66.) Guthrie's testimony therefore explains what she meant by "Interest Pd" on the Guthrie Document, which is otherwise consistent with her testimony.

For example, Guthrie testified that she actually gave Movant $305,000 and that the interest that Movant kept rolling over into new notes brought her total investment to approximately $850,000 on a total of eight promissory notes. (*Id.* at 844-46, 864.) The "Mid Cont Money Pd" column on the Guthrie Document does not list only the $305,000 that Guthrie actually gave Movant, but instead lists payments totaling

23

"$850,000.00" representing "8 notes." (Doc. 149 at 3.) Given Guthrie's testimony that she earned interest only on "paper" and reinvested that interest without any of it actually changing hands, it strains reason to conclude that "Money Pd" on the Guthrie Document represents both money she actually gave Movant *and* re-invested interest on that money that she did not actually give him, but "Interest Pd" represents *only* money she actually received. Indeed, after she listed the total "Interest Pd" from October 2004 to December 2005 as "586,310," Guthrie separately listed the $17,000 of interest payments in 2006 – the amount she testified she actually received – and then listed the grand total as "$603,310." (*Id.*) That configuration supports Guthrie's testimony that she actually received only $17,000 and that the other interest payments were only "paper" payments because they were rolled into new notes.

Moreover, the bottom-line number of $288,688 shown on the Guthrie Document as the difference between the grand total "Mid Cont Money Pd" and the grand total "Interest Pd," (*id.*), is consistent with Guthrie's testimony that her "net loss" was "288,000 plus *out of my money*," (Trial Tr. at 849 (emphasis added).) Guthrie testified that the "$288,000 plus" figure represented the difference between the money she *actually* gave Movant and the money she *actually* received from him, not the money reflected only on "paper." (Trial Tr. at 848-52, 864.) Guthrie's testimony therefore demonstrates that the amounts shown in the "Interest Pd" column on the Guthrie Document do not represent only money she actually received because, if they did, she would not be "out of my money" and instead would have actually received more money

– $603,310 – than she actually gave Movant – $305,000. For all those reasons, the Guthrie Document does not contradict Guthrie's testimony, even if that testimony was false, and thus is not exculpatory or impeaching evidence.

Even if the Guthrie Document were favorable to Movant, he has not shown a "reasonable probability of a different result" if the document had been available to him at trial. *See Banks*, 540 U.S. at 698-99. The prejudice standard for Movant's *Brady* claim "is appreciably more stringent" than the prejudice standard for his *Giglio* claim. *See Ventura*, 419 F.3d at 1284.

As discussed above, substantial evidence was presented at trial that Movant actually paid Guthrie, Karras, and other note-holders a lot of money on their promissory notes, yet the jury rejected the theory of Movant's defense and convicted him on all counts. The Guthrie Document, had it been admitted as evidence at trial, could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *See id.*; *see also Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("[T]here is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.").

Guthrie was only one of nine note-holders who testified at trial, and her testimony about the amount of money Movant paid her on her notes was contradicted by the BB&T account records and Van Wagoner's testimony. As explained above, the Guthrie Document does not contradict Guthrie's testimony. *See United States v. Jones*, 601 F.3d

25

1247, 1266-67 (11th Cir. 2010) (holding that suppression of witness's prior written statement that defendant wanted to use for impeachment was harmless because the statement was consistent with the witness' testimony and would have provided only "minimal" impeachment value given other impeaching evidence); *Hays v. Alabama*, 85 F.3d 1492, 1499 (11th Cir. 1996) ("[M]ost of the asserted uses of the suppressed statements would have been redundant . . . [and] no obvious reason suggests that the jury would have regarded the inconsistency [between the suppressed statements and the witness' testimony] as particularly significant"). The Guthrie Document also does not undermine the overwhelming evidence of Movant's guilt, including his own statements in the recorded meeting with Katz and Karras. *See Prevatte v. French*, 499 F. Supp. 2d 1324, 1338 (N.D. Ga. 2007) (rejecting *Brady* claim that suppressed documents would have impeached a government witness' credibility because the witness' testimony was "[f]ar from . . . the only evidence linking [the defendant] to the [crime]" and there was "overwhelming evidence of guilt"). Movant's due process claim based on *Brady* and *Giglio* fails on its merits.

## IV. <u>CERTIFICATE OF APPEALABILITY ("COA")</u>

Rule 11 of the Rules Governing § 2255 Cases provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A substantial showing of the denial of a constitutional right "includes showing that reasonable jurists could

26

debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (citations and quotations omitted).

A COA is not warranted here. As shown in Part III, *supra*, the record conclusively demonstrates that Movant is not entitled to relief, and the resolution of his claims is not reasonably debatable.

## V.   CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Movant's motion to vacate sentence [140] be **DENIED**. **IT IS FURTHER RECOMMENDED** that Movant be **DENIED** a certificate of appealability.

**SO RECOMMENDED** this *16* day of *August*, 2011.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE